946 F.2d 306
 70 Ed. Law Rep. 351
 In re Thomas C. CONKLIN, Maryland State Department of
Education, Special Education Appeal Number 07-89,
Plaintiff. (Three Cases)
John CONKLIN, Deborah Conklin, Parents and next friends of
Thomas Conklin, a minor, Plaintiffs-Appellants,
v.
ANNE ARUNDEL COUNTY BOARD OF EDUCATION, a body politic and
corporate, Defendant-Appellee. (Two Cases)
John CONKLIN, Deborah Conklin, Parents and next friends of
Thomas Conklin, a minor, Plaintiffs-Appellees,
v.
ANNE ARUNDEL COUNTY BOARD OF EDUCATION, a body politic and
corporate, Defendant-Appellant.
 Nos. 89-2220, 89-2225 and 90-2012.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1990.
Decided Oct. 4, 1991.
As Amended Oct. 23, 1991.
 
 1
 Frank B. Haskell, III, Haskell, Duley & Gale, Upper Marlboro, Md., argued, for plaintiffs-appellants.
 
 
 2
 Phillip Tyson Bennett, Cohen, Bennett & Greene, P.A., Annapolis, Md., argued, for defendant-appellee.
 
 
 3
 Before RUSSELL and NIEMEYER, Circuit Judges, and MICHAEL, District Judge for the Western District of Virginia, sitting by designation.
 
 OPINION
 MICHAEL, District Judge:
 
 4
 The United States Congress in 1975 passed the Education of the Handicapped Act ("EHA" or "the Act") to provide the handicapped children of this country with access to the public educational system. See 20 U.S.C. §§ 1400-85 (1990).[1] Alarmed by the large number of handicapped children that were either completely ignored or improperly serviced by American public schools, Congress sought primarily to throw open the doors of public education and heed the needs of these heretofore forgotten children. See generally Board of Educ. v. Rowley, 458 U.S. 176, 191-98, 102 S.Ct. 3034, 3043-47, 73 L.Ed.2d 690 (1982); 121 Cong.Rec. 19,494 (1975) (remarks of Sen. Javits) ("[A]ll too often, our handicapped children have been denied the opportunity to receive an adequate education[.]"); id. at 19,502 (remarks of Sen. Cranston) (Millions of handicapped children "are largely excluded from the educational opportunities that we give to our other children[.]"); id. at 23,708 (remarks of Rep. Mink) ("[H]andicapped children ... are denied access to public schools because of a lack of trained personnel[.]"). Access to a personalized educational program that provided the handicapped child with some degree of meaningful benefit was, however, as far as the EHA went. See generally Rowley, 458 U.S. at 191-98, 102 S.Ct. at 3043-47. With its passage, Congress contemplated only that a minimum--a federal floor below which our nation could not in conscience permit the education of handicapped children to fall--would be set for the provision of services to handicapped children by the States. See id. at 201, 102 S.Ct. at 3048 ("We therefore conclude that the ... basic floor of opportunity ... provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.").
 
 
 5
 With the benefit of hindsight, now that the crisis facing America's handicapped children is no longer as exigent, it is easy to suggest that Congress intended more than the establishment of a federal floor when it enacted the EHA. That argument is, however, directly at odds with the legislative history of the EHA, the reimbursement scheme created by the Act, and the interpretation of the Act's directives that has been provided by the United States Supreme Court. See A.W. ex rel. N.W. v. Northwest R-1 School Dist., 813 F.2d 158, 163 (8th Cir.1987); Pinkerton v. Moye, 509 F.Supp. 107, 112 (W.D.Va.1981); Note, Enforcing the Right to an Appropriate Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103, 1109-10 (1979). A careful analysis of the EHA, its history and judicial precedent concerning its interpretation reveals, instead, that Congress' objectives were less utopian and more grounded in the practical necessity of providing America's neglected handicapped children with some form of meaningful education. See Town of Burlington v. Department of Educ., 736 F.2d 773, 784 (1st Cir.1984); Scituate School Comm. v. Robert B., 620 F.Supp. 1224, 1233 (D.R.I.1985).
 
 
 6
 But just as the EHA was conceived only to provide a federal floor, Congress with the passage of the Act likewise did not attempt to take any action that would displace the primacy of the States in the area of education. See Rowley, 458 U.S. at 208, 102 S.Ct. at 3052 ("Congress' intention was not that the Act displace the primacy of the States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped."). By its very terms, the purpose of the EHA is to "assist" the States in the provision of education to handicapped children. See id. In this sense, the EHA can properly be regarded as a statute born of federalism: the Act sets a federal minimum to be complied with by the States regarding the provision of educational services to handicapped children, but it also gives the States considerable freedom to structure educational programs that exceed this federal benchmark. See generally New State Ice Co. v. Liebmann, 285 U.S. 262, 280, 311, 52 S.Ct. 371, 375, 386-87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory ... and try novel experiments[.]"); Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 546, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985). In other words, the States, in order to qualify for assistance under the Act, may not do less than the EHA demands, but they can certainly do more, see Note, Education--Board of Education v. Rowley: The Supreme Court takes a Conservative Approach to the Education of Handicapped Children, 61 N.C.L.Rev. 881 (1983) ("One additional consequence of Rowley may be that the States will follow the federal lead in construing the standards of [free appropriate public education] under the individual state statutes. While many state statutes are drafted in conformity with the federal model, many others have explicit standards set out in the statute. At least one state court has held that its statute requires more than Rowley. It is certain that, at minimum, the States must abide by the federal requirements."),[2] and it is this interplay between the roles of the States and Congress that drives much of the analysis in this opinion.
 
 
 7
 The present appeal was brought by John and Deborah Conklin ("appellants" or "the Conklins") to challenge the individualized educational program developed for their son, Thomas C. Conklin ("Thomas"), by the Anne Arundel County Board of Education ("Board of Education" or "the Appellee") within the State of Maryland. After exhausting all available options for administrative review of their son's individualized educational program, the Conklins and the Board of Education sought judicial review.[3] Ultimately, a bench trial was conducted in the case by the Honorable Joseph C. Howard, United States District Judge for the District of Maryland.
 
 
 8
 After considering the evidence and the arguments of counsel, Judge Howard concluded that the individualized educational program developed by the Board of Education for Thomas did not comply with the requirements of the EHA, but he ruled that Thomas' individualized educational plan must only be supplemented by weekly private tutoring to satisfy fully the mandate of the EHA. Acknowledging that the Conklins had achieved some "very limited relief" in their suit for judicial review, the court below also allowed them to recover a small amount, far below the amount that they requested, of their attorney's fees and costs from the appellee. The appellants now challenge Judge Howard's rulings both with regard to the EHA and the attorney's fees question, and the Board of Education, while generally concurring in the district court's rulings, has also cross-appealed the decision to require the individualized education program for Thomas to be supplemented by weekly private tutoring.
 
 
 9
 For reasons that will be explained more fully below, we affirm Judge Howard's rulings in this case concerning the EHA and the issue of costs and attorney's fees. However, due to notable differences in the language used within the EHA and the relevant Maryland statutes and regulations, and because the record before the court does not permit a clear resolution of the issue raised by these differences in language, we remand the case to the United States District Court for the District of Maryland for the purpose of considering whether Maryland law is more expansive than federal law concerning the education of handicapped children. Upon remand, Judge Howard may himself decide to remand the case to the Circuit Court of Anne Arundel County, Maryland, from which the Board of Education case was originally removed, or to certify the question presented to the Court of Appeals of Maryland, pursuant to their certification procedure. Such a procedure may be proper because of the importance of the issue to the State of Maryland, but we leave that decision to the court below in the sound exercise of its discretion.
 
 I.
 
 10
 The appellants in this case (the plaintiffs below) are the parents of Thomas C. Conklin ("Thomas"), an intelligent 13-year-old boy who suffers from a learning disability commonly known as dyslexia. This dyslexia has caused Thomas much frustration and has been an emotional strain to him, but more than anything else, the dyslexia has prevented him from achieving the reading and writing skills that are expected from students of his age. Until the beginning of the 1989-90 school year, Thomas was a student in the Anne Arundel County public school system. That school system is operated by the appellee (the defendant below), the Anne Arundel Board of Education, and it provides public educational services to both non-handicapped and handicapped children. The record in this case reveals that the Anne Arundel Board of Education, as a local education agency within the State of Maryland, is required to follow the EHA as well as state laws and regulations.
 
 
 11
 Early in his elementary-school career, it was discovered that Thomas suffered from the learning disability. As a result, the appellee was required to develop an individualized educational program that would provide Thomas with the special services necessary to allow him to receive the level of education benefit envisioned by state and federal law. Starting with the 1987-88 school year, the appellee prescribed placement of Thomas in a "Level 3" program in order to fulfill its obligations to him. A "Level 3" program consists of placement of the handicapped child into an educational environment with nonhandicapped children that is supplemented by 12 hours per week of special services tailored to the handicapped child's unique needs. In Thomas' case, however, the "Level 3" program proved inadequate by the standards of all concerned parties, and the appellee was forced to reconsider its individualized educational plan for this handicapped child.
 
 
 12
 While the reconsideration of his individualized educational plan was ongoing, the appellants had their son, at their own expense, evaluated by a private educational consultant, Hildreth Clagett. Due to the severity of his handicap, Clagett recommended that Thomas be placed in a full-time program designed specifically to aid children with dyslexia. Additionally, based on Clagett's recommendations, the appellants placed their son in a special full-time program at the Oakland School, specializing in one-on-one training between the teacher and student, during the summer of 1988 to enable him to cope better with his dyslexia.
 
 
 13
 When the individualized educational program was devised for the 1988-89 school year, the appellee prescribed placement of Thomas in a "Level 4" program in order to comply with federal and state requirements. A "Level 4" program consists of placement of the handicapped child into an educational environment with non-handicapped children that is supplemented by 20 hours per week of special services tailored to the handicapped child's unique needs. Based upon their unsatisfactory experience with the "Level 3" program and upon the counsel of Clagett, the appellants opposed the placement of their son in a "Level 4" program for the 1988-89 school year. Instead, they sought his placement in a "Level 5" or "Level 6" program which involves the separation of the handicapped child from a "mainstreamed" environment and his placement into a specialized program designed to provide educational services only to those students who have a particular handicap.[4] Apparently, the appellee did not share the appellants' views regarding their son's placement because, during the 1988-89 school year, Thomas was enrolled in a "Level 4" program.
 
 
 14
 Dissatisfied with the appellee's actions, the appellants, during the summer of 1988, sought administrative review of their son's individualized educational program prescribed by the appellee. They also hired, at their own expense, a private tutor for Thomas for the 1988-89 school year to assist in his education, and they returned him, again at their own expense, to the Oakland School during the summer of 1989. Basically, the Conklins believed that their son was receiving minimal educational benefit from the "Level 4" placement and that their supplemental efforts were necessary if he was ever to achieve even functional literacy. What was probably the "last straw" in the relationship between the appellants and the appellee came when the appellee announced that Thomas' "Level 4" placement would be continued for the 1989-90 school year. At that point, the appellants removed Thomas from the public school system and placed him, at their own expense, in the Summit School. Although the Summit School is not accredited by the State of Maryland, it is an institution which the Conklins believe is designed to assist children with Thomas' handicap and is, in their estimation, the equivalent of "Level 5" placement.[5]
 
 
 15
 As indicated above, the appellants also sought administrative review of this matter beginning in the summer of 1988. At the first level of review, a single hearing examiner considered their case and concluded that, based on the totality of the circumstances regarding Thomas' handicap, his placement in a "Level 4" program was proper. At the next level of review, the appellants presented their case to the Maryland State Board of Education, via a hearing review panel comprised of three hearing examiners, and the panel concluded that "Level 4" placement, supplemented with three hours per week of private tutoring, fulfilled the legal obligations of the State of Maryland to Thomas. Both the appellants and the appellee asked the panel to reconsider this decision, and after conducting a further hearing, the panel revised its initial ruling only by adding the requirement that a specific instructional methodology be employed by Thomas' instructors within the "Level 4" program and by granting the appellants' request for reimbursement for their costs in providing their son with a private tutor during the 1988-89 school year. The panel denied the appellants' request for a higher-level placement for their son, and it denied their request for reimbursement for the costs associated with sending Thomas to the Oakland School during the summer of 1988.
 
 
 16
 Following the conclusion of the administrative-review process, the Board of Education sought judicial review by filing suit in the Circuit Court for Anne Arundel County in September of 1989. Likewise, the Conklins simultaneously filed suit in the United States District Court for the District of Maryland seeking judicial review of the actions taken by the Maryland agencies regarding their son. The state-filed action was removed to the federal court, where the separate lawsuits were consolidated into one case, and a three-day bench trial was conducted before Judge Howard in October of 1989. Before the district court, the appellants sought, inter alia, the following relief: (1) a declaration that their son would not receive a free appropriate public education based upon the actions by the relevant Maryland agencies; (2) placement of their son in the Summit School; and (3) reimbursement for the costs that they incurred in providing their son private tutoring and in sending him to the Oakland School during the summers of 1988 and 1989. The board of education, on the other hand, sought, inter alia, the following relief before Judge Howard: (1) a declaration that its obligation to provide Thomas with a free appropriate public education was satisfied when he was placed in a "Level 4" program with no private tutoring; and (2) a ruling that it was not required to reimburse the appellants for the costs they incurred in providing their son with private tutoring during the 1988-89 school year and in sending their son to the Oakland School during the summers of 1988 and 1989.
 
 
 17
 After considering all of the evidence and the arguments offered by counsel, Judge Howard concluded that "Level 4" placement without additional private tutoring, the individualized educational program prescribed by the appellee, did not provide Thomas with the "free appropriate public education" that the EHA requires. The court below ruled, nonetheless, that Thomas would be provided the "free appropriate public education" required by the EHA if his "Level 4" placement was supplemented with two hours per week of private tutoring. Judge Howard believed that, based on the evidence before him, Thomas, when enrolled in a "Level 4" program augmented by weekly private tutoring, had received the level of meaningful educational benefit required by federal law. Significantly, Judge Howard specifically rejected the appellants' demand that their son be placed in a higher level program, and while allowing them reimbursement for the costs that they incurred in providing Thomas with private tutoring during the 1988-89 school year, he denied the appellants any reimbursement for the costs that they had incurred in sending their son to the summer programs at the Oakland School and to the school-year program at the Summit School. In resolving the question of what obligations the EHA imposes on the board of education in Thomas' case, the court below acknowledged that the appellants had achieved "some very limited success," and as a result, it determined that the appellants should be entitled to recover some of their costs and attorney's fees from the appellee. The amount that the court below allowed the appellants to recover was, however, far below the amount that was sought by the appellants.
 
 
 18
 Thereafter, the appellants appealed Judge Howard's rulings regarding both the attorney's-fees question and the EHA question to this court. The appellee likewise cross-appealed the district court's conclusion that the EHA required the augmentation of Thomas' individualized educational program with two hours per week of private tutoring and its decision that the appellants were entitled to reimbursement for the costs that they incurred in providing their son with private tutoring during the 1988-89 school year. All issues in this case have been thoroughly briefed by the parties, and we recently heard oral argument on these issues. Accordingly, this case is ripe for resolution.
 
 II.
 
 19
 Since its passage in 1975, "volumes" have been written about the EHA. See, e.g., Burke County Bd. of Educ. v. Denton, 895 F.2d 973 (4th Cir.1990); Hall v. Vance County Bd. of Educ., 774 F.2d 629 (4th Cir.1985). Although its application has proven very complex, the Act itself is, nonetheless, very simple conceptually. In basic terms, the EHA is a means by which the federal government provides financial assistance to the States for the education of the nation's handicapped children. See, e.g., Rowley, 458 U.S. at 179-84, 102 S.Ct. at 3037-40. In order to qualify for this financial assistance, the EHA requires the States to enact statutes and regulations to meet the Act's conditions. See id. By its very terms, however, the Act was never designed to displace the primacy of the States in the area of education for handicapped children; and very often, the States have simply modified or expanded existing state statutes concerning education generally to reflect the requirements of the EHA. See Zirkel, Building an Appropriate Education from Board of Education v. Rowley: Razing the Door and Raising the Floor, 42 Md.L.Rev. 466, 487-91 (1983) [hereinafter Zirkel ].
 
 
 20
 Pursuant to the Act, each state, in order to receive federal funds, is required to develop, via its local educational agency (commonly known as a "LEA"), an individualized educational program (commonly known as an "IEP") for each handicapped child in its school system which will provide the child with a free appropriate public education (commonly known as a "FAPE") in the least restrictive environment. See Rowley, 458 U.S. at 179-84, 102 S.Ct. at 3037-40. The individualized educational program is the cornerstone of the EHA, and in order to ensure compliance by the States, the Act emphasizes certain procedural safeguards that the States must follow when developing the individualized educational program for a given child. See id. The participation of the child's parents, teachers, etc. in the development of the individualized educational program, see 20 U.S.C. § 1415(a)-(b) (1990), and the creation of an intricate system of administrative and judicial review, see 20 U.S.C. § 1415(c)-(e) (1990), are examples of the procedural safeguards that participating states must enact to be eligible for federal funds pursuant to the EHA. See Rowley, 458 U.S. at 179-84, 102 S.Ct. at 3037-40.
 
 
 21
 One of the most difficult aspects of the EHA has concerned the definition of the "free appropriate public education" that the States are required to provide their handicapped children. In its seminal opinion in Board of Education v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982), the United States Supreme Court held that the "free appropriate public education" requirement is satisfied when a state provides the handicapped child with "personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction." The Court, elsewhere in the Rowley opinion, described the "free appropriate public education" requirement as providing the "basic floor of opportunity" envisioned by the Act, 458 U.S. at 201, 102 S.Ct. at 3048, and the Court noted the additional requirement that, whenever possible, the "free appropriate public education" should be provided in a "mainstreamed" classroom consisting of both handicapped and nonhandicapped children, id. at 202, 102 S.Ct. at 3048.
 
 
 22
 As a general rule, the Court observed that the goal of the Act was the provision of educational services that were designed to enable the handicapped child to achieve a "reasonable degree of selfsufficiency," id. at 201 n. 23, 102 S.Ct. at 3048 n. 23, and the Court further commented that "the achievement of passing marks and advancement from grade to grade[,] ... [w]hen the handicapped child is being educated in the regular classrooms of a public school system[,] ... will be one important factor in determining educational benefit," id. at 207 n. 28, 102 S.Ct. at 3051 n. 28. The Court did not, however, rule that grade-to-grade advancement was dispositive on the issue of a "free appropriate public education." Indeed, the Court conceded that, in some cases, even a handicapped child that was receiving passing marks and reasonably advancing from grade to grade might not be receiving the "free appropriate public education" envisioned by the EHA. See id. at 203 n. 25, 102 S.Ct. at 3049 n. 25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school is automatically receiving a 'free appropriate public education.' "). Likewise, the converse of this statement is also true: a handicapped child who is not receiving passing marks and reasonably advancing from grade to grade is not necessarily being deprived of a "free appropriate public education." Due to the severity of their handicaps, some children, even with herculean efforts by the state, will never be able to receive passing marks and reasonably advance from grade to grade, and the state should not be placed in the predicament of being forced to comply with an impossible burden or being found in violation of the EHA. All the Court has said is that the achievement of passing marks and the reasonable advancement from grade to grade are important factors to be considered in determining whether a handicapped child is receiving a "free appropriate public education" pursuant to the EHA. See id. at 207 n. 28, 102 S.Ct. at 3051 n. 28.
 
 
 23
 In terms of judicial review of individualized educational programs developed for handicapped children, the Rowley Court held that the reviewing court's task is two-fold. First, the reviewing court is to determine whether the state has "complied with the procedures set forth in the Act[,]" and second, the reviewing court is to determine whether the individualized educational program developed through the Act's procedures is "reasonably calculated to enable the child to receive educational benefits[.]" Id. at 206-07, 102 S.Ct. at 3051. Regarding this two-fold test, the Rowley court added:
 
 
 24
 It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting [individualized educational program] against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the [individualized educational program], as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content of an [individualized educational program].
 
 
 25
 Id. at 205-06, 102 S.Ct. at 3050. Consequently, this court must measure against this two-part test Thomas' individualized educational program and the actions of the court below in the present case.
 
 
 26
 Before Judge Howard, the appellants conceded that they "had no quarrel with the procedural aspects of whether or not [Thomas] has received a free appropriate public education." They stated that the crux of the controversy concerned the substance of the education that their son was receiving. Therefore, the proceedings before Judge Howard centered on the second prong of the Rowley test--whether the individualized educational program developed through the Act's procedures is "reasonably calculated to enable the child to receive educational benefits"--since procedural compliance with the Act was conceded. This court likewise acknowledges that the first prong of the Rowley test has been satisfied, and the remaining analysis of the EHA is devoted to determining whether Thomas was receiving substantively the "free appropriate public education" to which he was entitled.
 
 
 27
 Regarding the substance of the education that the appellee was providing Thomas, Judge Howard carefully reviewed the evidence and argument of counsel and stated:
 
 
 28
 The law requires that all handicapped children have a free appropriate public education.... In addition, that education must be in the least restrictive environment available.... An appropriate education[,] however[,] is a broad concept[,] difficult to define beyond a case[-]by[-]case analysis.... The Supreme Court has given some substance to this concept. The requirement of a free appropriate public education is satisfied if the school provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." More specifically, "if the child is being educated in the regular classrooms of the public education system, [the instruction] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." ... The language of advancing from grade to grade, although not the benchmark of an appropriate education, ... is a useful standard for the facts of the present case. Thomas made a one grade advancement in terms of test scores in the sixth grade. This is what the Act requires, and the method of instruction which produced this advancement is appropriate for Thomas. Therefore, the ["]free appropriate public education["] for this student consists of a # AD7F BD# Level [4"] placement including two hours a week of individualized tutoring.... The [c]ourt is aware that the [h]earing [r]eview [b]oard recommended three hours of tutoring. That particular number of hours, however, was not supported by the preponderance of the evidence in this trial or the prior administrative hearings. The evidence does show that Thomas made considerable progress with two hours of tutoring[;] therefore, two hours a week is the appropriate amount.... Beyond concluding that Thomas did not receive a free appropriate education, and that ["]Level [4"] placement including tutoring is appropriate, the [c]ourt declines to order further adjustments. This [c]ourt is not in a better position than the educators in Anne Arundel County to make a detailed list of Thomas' requirements. The [c]ourt is mindful that the primary responsibility for formulating the education to be afforded a handicapped child, and for choosing the educational method suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.... In addition, this [c]ourt's ruling should in no way be construed as indicating what constitutes a ["]free appropriate public education["] for Thomas' subsequent school years.
 
 
 29
 The district court then went further to hold that the appellants were entitled to receive reimbursement for the costs that they incurred in providing their son with private tutoring during the 1988-89 school year. The district court did not allow the appellants to recover reimbursement for the costs that they incurred in sending their son to the summer programs at the Oakland School, and it did not order the board of education to reimburse the appellants for the costs that they incurred in placing Thomas at the Summit School. Finally, Judge Howard acknowledged that the appellants had achieved some "very limited" success and ordered the board of education to pay some of the appellants' costs and attorney's fees, albeit an amount significantly lower than the total amount claimed by the appellants.
 
 
 30
 The court below correctly applied the requirements of the EHA to the facts of the present case in reaching its decision, and hence, the decision below is affirmed insofar as the EHA is concerned. As previously indicated, the Act is designed to create a federal floor, and Judge Howard correctly ruled that the "free appropriate public education" requirement of the Act was satisfied when Thomas was provided with "Level 4" placement augmented by two hours per week of private tutoring. Counsel for the appellee has, however, suggested that some dicta in Judge Howard's opinion is in error and should be disavowed by this court. In particular, counsel for the appellee contends that the following language imposes a burden on the States that was not intended by the Rowley Court when it interpreted the Act and does not comport with the common understanding that the Act creates a federal floor for the provision of educational services to handicapped children.
 
 
 31
 On page four of its memorandum opinion, the court below held:
 
 
 32
 The language of advancing from grade to grade, although not the benchmark of an appropriate education, ... is a useful standard for the facts of the present case. Thomas made a one grade advancement in terms of test scores in the sixth grade. This is what the Act requires[.] "
 
 
 33
 (emphasis added). Counsel for the appellee argues that this language seems to dictate, as a general rule, annual grade promotion as a hard-and-fast gauge for determining whether a handicapped child is being provided with the "free appropriate public education" required by the EHA. This court does not share the reading of this language propounded by counsel for the appellee. Rather, Judge Howard was merely indicating that annual grade promotion was required to be considered by Rowley and by the EHA, not in all cases, but in Thomas' case.[6]
 
 
 34
 Nevertheless, Judge Howard's language may be construed as ambiguous, and the EHA, as interpreted by the Rowley Court, does not require, in all cases, annual grade promotion as a pre-condition for determining whether a given handicapped child is receiving a "free appropriate public education. Therefore, to the extent that the district court's dicta could be read as requiring grade-to-grade advancement as a mandatory requirement of the EHA, this court overrules those dicta. The United States Supreme Court has stated that passing marks and grade-to-grade advancement can be an appropriate gauge--"one important factor"--in many cases in determining whether a particular handicapped child is being provided a "free appropriate public education," but annual grade promotion and passing marks are not alone dispositive. Some children, due to the extent of their handicaps, will never be able to perform at grade-level and will require several years to achieve what would be to a non-handicapped child a year's worth of progress. In that instance, the EHA cannot expect the States to do the impossible. Other children with less debilitating handicaps could achieve passing marks and annual grade promotion even without receiving any special educational services. In that instance, the child's innate abilities will not relieve the States of their obligations pursuant to the Act. In short, passing marks and annual grade promotion are important to the EHA, but a child's ability or inability to achieve such marks and progress does not automatically resolve the inquiry where the "free appropriate public education" requirement is concerned, and to the extent that the district court, in dicta, invested passing marks and annual grade advancement with more significance than the Rowley Court, those dicta must yield to the language and logic of the Rowley opinion.
 
 
 35
 Regarding the decision of the court below to award attorney's fees and costs in the amount prescribed, it should be initially noted that, in reviewing this decision, this court is required to apply an abuse-of-discretion standard. See Abu-Sahyun v. Palo Alto Unified School Dist., 843 F.2d 1250 (9th Cir.1988); Muth v. Central Bucks School Dist., 839 F.2d 113 (3rd Cir.1988), rev'd on other grounds, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); 20 U.S.C. § 1415(e) (1990). In his memorandum opinion on the issue of costs and attorney's fees, Judge Howard initially found that the appellants, by achieving some "very limited" relief, had prevailed so as to make proper the award of attorney's fees and costs. The district court then calculated a reasonable hourly rate for the appellants' attorney and determined the number of hours that the appellants' attorney had spent on the case. Thereafter, the total number of hours spent on the case was reduced by the number of hours spent in duplicative and repetitive work; the total number of hours spent on the case was reduced by the number of hours that were unreasonable due to incomplete, inaccurate and irregular records; and finally, the total amount of recovery was reduced by the limited nature of the appellants' success. Similarly, the court below reduced the amount of recoverable costs and expenses claimed by the appellants due to incomplete and insufficient record-keeping.
 
 
 36
 After reviewing the complete record in this case, nothing is found in the district court's decision that requires correction or modification by this court, and hence, this court also affirms that portion of the ruling that pertains to the award of costs and attorney's fees. See Max M. v. Illinois State Bd. of Educ., 684 F.Supp. 514, 523-31 (N.D.Ill.), aff'd, 859 F.2d 1297 (7th Cir.1988); see also Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Having affirmed the rulings of the court below in this case, the necessary analysis is largely at a close. One additional point, however, bears significant discussion.
 
 III.
 
 37
 Section 1.01 of Title 13A.05 of the Code of Maryland Regulations provides, in pertinent part, that:State and local education agencies shall provide free and appropriate educational programs and related services for all handicapped children, from birth through the age of 20, who are found to be in need of special educational services. These appropriate services are to begin as soon as the child can benefit from them, provided services for children under the age of [five] shall be phased in as required by law.
 
 
 38
 Md.Regs.Code tit. 13A.05, § 1.01 (1989). "Special educational services" are defined in the Maryland Code as:
 
 
 39
 [T]he educational services necessary to assure that all handicapped children are given the opportunity to reach appropriate levels of knowledge and learning skills consistent with their potential and includes the full range of these services, including special equipment, therapeutic treatments ancillary to education, and transportation, whether provided as part of or in addition to regular classroom placement or in separate public or private classes or facilities.
 
 
 40
 Md.Educ.Code Ann. § 8-401(a)(2) (1989) (emphasis added). Pursuant to Maryland law, local school boards are free to "adopt [individualized educational programs] that exceed state standards," Md.Educ.Code Ann. § 8-404(d) (1989) (emphasis added), but all school boards within the state are required to ensure that:
 
 
 41
 [A]ll children, birth through age 20, residing in the [s]tate who are handicapped, regardless of the severity of their handicap[s], and who are in need of special educational services or related services, or both, are identified, assessed, and provided with appropriate special educational services as consistent with Maryland law and federal law.
 
 
 42
 Md.Regs.Code tit. 13A.05, § 1.03B (1989) (emphasis added).
 
 
 43
 These diverse provisions are clearly part of the statutory and regulatory scheme enacted by Maryland to bring the state into compliance with the EHA and to enable the state to take advantage of the funding provided by the Act, see Buchholtz v. Iowa Dep't of Pub. Instruction, 315 N.W.2d 789, 793 (Iowa 1982) ("The [state] statutes are intended to make state and local educational programs eligible for federal funding under the [EHA.]"), but these provisions are also notable for two other reasons. First, these Maryland statutes and regulations themselves distinguish between federal and state law, see e.g., Md.Regs.Code tit. 13A.05, § 1.03B (1989) (local school boards are to ensure that all handicapped children are "provided with appropriate special educational services as consistent with Maryland law and federal law[.]"), and between state and local law, see, e.g., Md.Educ.Code Ann. § 8-404(d) (1989) (local school boards are free to "adopt [individualized educational programs] that exceed state standards[.]"). See also Maryland Ass'n for Retarded Children v. Maryland, Equity No. 77676 (Balt.Co.Cir.Ct.1974) (discussing the requirements of Maryland state law concerning the education of handicapped children); see generally Steinhardt, A Procedural Guideline for Implementing the Right to Free Public Education for Handicapped Children, 4 Balt.L.Rev. 136 (1974) (discussing Maryland state law concerning the education of handicapped children); Article, Maryland's Exchangeable Children: A Critique of Maryland's System of Providing Services to Mentally Handicapped Children, 42 Md.L.Rev. 823 (1983). Second, the language employed by these statutes and regulations is not in conformity with the "free appropriate public education" language used in the federal model, and this divergence in the wording between state and federal law may indicate that, pursuant to its own state law, Maryland intended to provide its handicapped children with a level of educational services above the federal minimum. See Zirkel at 487-89 ("The principal avenue for reaching a broader and higher standard beyond the confines of Rowley is the special[-]education legislation in some states.... [In their own statutes, the] state[s] may go beyond [the standards] of the [EHA] without running afoul of Rowley."); Stark, Tragic Choices in Special Education: The Effect of Scarce Resources on the Implementation of Public Law Number 94-142, 14 Conn.L.Rev. 477, 524 (1982) (discussing the potential for an approach to the provision of educational services to handicapped children in the United States that is characterized by federalism). In regard to this last point, an examination of the development of the law relating to the education of handicapped children in other states may be illuminating.
 
 
 44
 In the State of North Carolina, for example, the General Assembly has declared that it is "the policy of the State to ensure every child a fair and full opportunity to reach his full potential[.]" N.C.Gen.Stat. § 115C-106 (1990).[7] Interpreting its state's laws pertaining to the education of handicapped children, the Court of Appeals of North Carolina has stated:
 
 
 45
 Although our statute was designed, in part, to bring the State in conformity with the federal statute, ... the Rowley Court's interpretation of Congress' intent does not control our interpretation of our General Assembly's intent. We believe that our General Assembly "intended to eliminate the effects of the handicap, at least to the extent that the child will be given an equal opportunity to learn if that is reasonably possible." Under this standard[,] a handicapped child should be given an opportunity to achieve his full potential commensurate with that given other children.
 
 
 46
 Harrell v. Wilson County Schools, 58 N.C.App. 260, 263, 293 S.E.2d 687, 690 (1982) (citations and footnotes omitted), appeal dismissed, 306 N.C. 740, 295 S.E.2d 759 (1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1251, 75 L.Ed.2d 481 (1983); see generally Rowley, 458 U.S. at 212, 102 S.Ct. at 3053 (White, J., dissenting). Recently, this court reaffirmed the distinction between federal and North Carolina law in Burke County Bd. of Educ. v. Denton when it was said:
 
 
 47
 The [appellants'] argument that North Carolina law, if not federal law, requires the provision of [a certain type of services for their child] fails as well. As they point out, a federal court must determine whether an [individualized educational program] meets the requirements of state law if the state requires a level of substantive benefit greater than that required under federal law.... North Carolina apparently does require more than the EHA. The special education program must provide the child with an equal opportunity to learn if that is reasonably possible, ensuring that the child has an opportunity to reach her full potential commensurate with the opportunity given other children.... The district court's factual findings[, however,] compel the conclusion that the in-home services sought by the [appellants] are not the kind of services which must be provided, under federal or North Carolina law, by the local educational agency.
 
 
 48
 895 F.2d 973, 982-83 (4th Cir.1990) (citations omitted). Accordingly, within the State of North Carolina, it has been recognized that state lawmakers have built upon the federal floor created by the EHA and have decided to provide the handicapped children, within the state, with a level of educational services that surpasses the national minimum.
 
 
 49
 In the Commonwealth of Massachusetts, similarly, the legislature has required that its handicapped children be educated so as "to minimize the possibility of stigmatization and to assure the maximum possible development in the least restrictive environment[.]" Mass.Gen.Laws Ann. ch. 71B, § 2 (West 1990). Like the approach taken by the North Carolina Court of Appeals in the Harrell case, a hearing officer within the Massachusetts administrative review system held:
 
 
 50
 [The school board] argues that [the handicapped child's] placement in [its] program would meet the standard recently stated by the [United States] Supreme Court in ... Rowley. I do not concur. I find that to the extent that Rowley applies to the case before me, there is nothing in that decision which would change my ruling in this case. First, Rowley deals with a question of statutory interpretation of the [f]ederal special education law, and is largely based upon an analysis of [f]ederal [c]ongressional history. Such analysis [cannot] presume to be a determinative reading of the Massachusetts statute and its legislative history. Insofar as my conclusion in this case is based upon Massachusetts as well as [f]ederal law, the Rowley decision is not controlling. Indeed, the [C]ourt repeatedly stresses the paramount role of the States in the area of education.
 
 
 51
 In re Brockton Pub. Schools, Mass. Case No. 5532 (Massachusetts State Educ. Agency August 16, 1982), reprinted in 3 EHLR (CRR) 504:128, 504:131 (1982); see also In re West Brookfield Pub. Schools, Mass. Case No. 6016 (Mass. State Educ. Agency Oct. 19, 1982), reprinted in 3 EHLR (CRR) 504:166, 504:169 (1982). Thereafter, the Massachusetts Supreme Judicial Court adopted the approach taken by this hearing examiner when it ruled in Stock v. Massachusetts Hosp. School, 392 Mass. 205, 211, 467 N.E.2d 448, 452 (1984), cert. denied, 474 U.S. 844, 106 S.Ct. 132, 88 L.Ed.2d 109 (1985), that state education law required the state department of education to administer special education programs "to assure the maximum possible development of a child with special needs," and this approach was also recognized by the First Circuit Court of Appeals in David D. v. Dartmouth School Comm., 775 F.2d 411, 423 (1st Cir.1985), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986). Consequently, as with the State of North Carolina, the Commonwealth of Massachusetts also seems to have taken the initiative in the area of education for handicapped children and to have adopted a self-imposed standard more rigorous than that required by the EHA.
 
 
 52
 Like the legislatures of these other two states, the Michigan Legislature has also declared that its state board of education is required to adopt a state plan for special education services which "shall provide for the delivery of special education programs and services designed to develop the maximum potential of every handicapped person." Mich.Comp.Laws Ann. § 380.1701 (West 1988). Consistent with the examples set by North Carolina and Massachusetts, a hearing officer within the Michigan administrative review system has held:
 
 
 53
 Michigan's statutes which require school districts to provide special education for the handicapped "designed to develop the maximum potential" ... [are] ... more stringent than the [f]ederal ["free appropriate public education"].
 
 
 54
 In re Traverse Bay Area Intermediate School Dist., Mich. Case No. 82-0143 (Mich. State Educ. Agency August 9, 1982), reprinted in 3 EHLR (CRR) 504:140, 504:142 (1982). Although the source of this pronouncement does not share the same level of eminence where the interpretation of its state law is concerned as the North Carolina Court of Appeals and the Supreme Judicial Court of Massachusetts have regarding the interpretation of their states' laws, Michigan, like North Carolina and Massachusetts, seems to have also committed itself to providing a level of service to handicapped children that surpasses the federal floor.
 
 
 55
 Probably the best illustration, however, of the effect that the wording of state statutes and regulations can have on the level of services that a state is required to provide its handicapped children and of the ability of the States to extend their commitment to handicapped children beyond the level prescribed by the EHA is found in the State of Iowa. Prior to 1982, the Iowa Legislature declared that it was a state policy:
 
 
 56
 to provide and to require school districts to make provisions, as an integral part of public education, for special education opportunities sufficient to meet the needs and maximize the capabilities of children requiring special education.
 
 
 57
 Iowa Code Ann. § 281.2 (West 1982). The Supreme Court of Iowa first had occasion to interpret this provision in 1982 in Buchholtz v. Iowa Department of Public Instruction, 315 N.W.2d 789 (Iowa 1982). In that case, the Iowa Supreme Court held that, pursuant to state law, "equality of education for handicapped and nonhandicapped children" was required. Id. at 793. The Buchholtz court added that state law "requires a parity of educational opportunity between these groups." Id. Thereafter, the Iowa Legislature, realizing that the interpretation given its statute by the Iowa Supreme Court would require an increased commitment of state funds to bring the state's public educational system into compliance, amended its statutes to require only the EHA's "free appropriate public education." The relevant Iowa statute now reads:
 
 
 58
 It is the policy of this state to require school districts and state operated educational programs to provide or make provision, as an integral part of public education, for a free appropriate public education sufficient to meet the needs of all children requiring special education.
 
 
 59
 Iowa Code Ann. § 281.2 (West 1988). In Iowa's example, therefore, the power of a state legislature to build upon the federal floor created by the EHA is plainly illustrated. However, the Iowa legislature chose to change from its former expansive commitment to handicapped children. Nonetheless, Iowa's experience shows the extent to which a state legislature can certainly overtake federal initiative in its statutes pertaining to the education of handicapped children.
 
 
 60
 Another example of the power of the States (untested power in most instances) to take the lead in the provision of educational services to handicapped children is found in Arkansas' treatment of the subject. Undoubtedly following the example set by Iowa, the Arkansas Legislature also changed its own state code in an effort to withdraw from the expansive standard that it had previously enacted. In 1987, Section 6-41-202(a)(1) of the Arkansas Code provided that:
 
 
 61
 It shall be the policy of this state to provide and to require school districts to provide, as an integral part of the public schools, special education sufficient to meet the needs and maximize the capabilities of handicapped children.
 
 
 62
 Ark.Stat.Ann. § 6-41-202(a)(1) (1987). Thereafter, Section 6-41-202(a)(1) was amended, and that provision now reads:
 
 
 63
 It shall be the policy of this state to provide and to require school districts to provide, as an integral part of the public schools, a free appropriate public education (FAPE) for handicapped students. The State Board of Education is therefore expressly authorized to assign responsibility for providing free appropriate public education of any handicapped student to an appropriate school district.
 
 
 64
 Ark.Stat.Ann. § 6-41-202(a)(1) (Supp.1989). Once again, Arkansas' decision to withdraw from its former expansive posture may be regrettable, but the state's ability to enact a special-education statute, more expansive than the federal minimum, and then later to repeal the statute, shows the potential power of the States in this area.
 
 
 65
 Other states also have statutes that seem to impose standards for the education of their states' handicapped children greater than the EHA. See Ariz.Rev.Stat.Ann. § 15-763 (1984) ("All handicapped children shall receive special education programming commensurate with their abilities and needs."); R.I.Gen.Laws § 16-24-1 (1988) ("[T]he school committee of the city or town shall provide the type of special education that will best satisfy the needs of the handicapped child[.]"). Section 49-10-101(a)(1) of the Tennessee Code, for instance, provides that:
 
 
 66
 It is the policy of this state to provide, and to require school districts to provide, as an integral part of free public education, special education services sufficient to meet the needs and maximize the capabilities of handicapped children.
 
 
 67
 Tenn.Code Ann. § 49-10-101(a)(1) (1990). No court has yet addressed the question of whether this provision imposes on the State of Tennessee, via state law, any obligations other than those imposed by the EHA. Moreover, the Tennessee Legislature has not changed this provision, so as to remove the language that seems to go beyond the standard prescribed by the EHA. See also Muth, 839 F.2d at 120 n. 13 (suggesting that Pennsylvania law may go "beyond the federal minimum to set a higher substantive standard for the quality of the program which must be available to handicapped children."). Accordingly, it may be that the Tennessee Legislature, like its counterparts in North Carolina, Michigan and Massachusetts, has chosen to surpass, via state law, the federal floor for the provision of educational services to handicapped children which is prescribed by the EHA.
 
 
 68
 All that is suggested by the foregoing is that it may be that Maryland law is like Tennessee law in that certain language within the Maryland Code seems possibly to indicate that the Maryland Legislature has chosen to adopt a higher standard where the education of handicapped children is concerned than that required by the EHA.
 
 
 69
 A plan which provides "educational benefit," see Rowley supra, is not necessarily equivalent to a plan which gives to handicapped children "the opportunity to reach appropriate levels of knowledge and learning skills consistent with their potential ..." See Md.Educ.Code Ann. § 8-401(a)(2) (1989). Furthermore, as with the Tennessee statute, no court has ruled, as of the writing of this opinion, that the Maryland law is or is not more expansive. For instance, the relevant language of the Maryland statutes and regulations may signal a heightened commitment by the state to the programs that are employed to assure that handicapped children receive a proper education. It can scarcely be supposed that a single year-end review of the handicapped child's individualized educational program will give that child the "educational benefit" required by Rowley. See 458 U.S. at 203, 102 S.Ct. at 3049. Rather, regular attention throughout the school year is realistically needed to assure that the individualized educational program is meeting the ever-evolving needs and capabilities of the handicapped child. When the relevant Maryland statute speaks of giving to handicapped children "the opportunity to reach appropriate levels of knowledge and learning skills consistent with their potential[,]" Md.Educ.Code Ann. § 8-401(a)(2) (1989), the legislature may be indicating a state commitment to evaluating the individualized educational programs of handicapped children on a more regular basis than that required by the EHA. Such heightened evaluation would assure that handicapped children, whose needs and capabilities are, to some degree, in a constant state of flux throughout the learning process, reach "appropriate levels" in their education. See id.
 
 
 70
 The parties in this action did not raise this issue before the court below, and as a result, the district court did not rule on the issue. For this reason, we remand the case to the district court so that the question of whether Maryland law goes beyond the federal minimum to set a higher substantive standard for the provision of educational services to handicapped children can be considered.[8] Upon remand, the district court may itself decide to remand the case to the Circuit Court for Anne Arundel County, from which the appellees' case was originally removed. Certification of the question to the Court of Appeals of Maryland may also be considered by the district court as an appropriate way to seek the answer to this issue.
 
 
 71
 In a lengthy opinion in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), Mr. Justice Brennan discussed the matter of pendent jurisdiction, which bears on the question before us.
 
 
 72
 The state and federal claims must derive from a common nucleus of operative fact. But, if considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.
 
 
 73
 That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188 (1938) ]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.
 
 
 74
 Id. at 725-27, 86 S.Ct. at 1138-39 (footnotes omitted) (emphasis in original).
 
 
 75
 Whichever court ultimately considers the issue, it may conclude, after examining the issue in greater depth, that Maryland law does, indeed, surpass federal law in terms of its commitment to the education of handicapped children. Such a conclusion would not be unprecedented and would comport with the pattern of legal developments that has occurred in such states as North Carolina, Massachusetts and Michigan. Such a conclusion, furthermore, would mirror, in the State of Maryland, the trend that has occurred nationwide in the area of school finance following the United States Supreme Court's opinion in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
 
 
 76
 In Rodriguez, the Court held that the particular plan employed by the State of Texas to fund its public school system did not violate the United States Constitution. See id. at 54-55, 93 S.Ct. at 1307-08. Pursuant to the plan, half of the funds for a particular school district were provided by the State of Texas; the other half of the funds were obtained through an ad valorem tax on property within the particular school district. See id. at 37-38, 93 S.Ct. at 1299. The parents of many school children, residing in school districts having lower property-tax bases, sought class relief, arguing that the Texas public school system's reliance on property taxation favors more affluent areas and violates the Equal Protection Clause of the United States Constitution. See id. at 4-5, 93 S.Ct. at 1282. In its opinion in the case, the Court ruled that the Texas plan did not violate any "fundamental" right or liberty, and it did not disadvantage any "suspect" classification. See id. at 53, 93 S.Ct. at 1307. Accordingly, the Court upheld the Texas plan for school finance. See id.
 
 
 77
 Following the Rodriguez decision, the highest courts of many states ruled that, while not running afoul of the federal constitution, similar school funding schemes within their own states violated their state constitutions. See, e.g., Serrano v. Priest, 18 Cal.3d 728, 768, 557 P.2d 929, 958, 135 Cal.Rptr. 345, 374 (1976), cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977) ("[O]ur state equal protection provisions, while substantially the equivalent of the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable."); Baker v. Fairbanks, 471 P.2d 386, 401-02 (Alaska 1970) ("While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our ... [c]onstitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead[,] we should be moving concurrently to develop and expound the principles embedded in our constitutional law."); see generally, Note, Developments in the Law: The Interpretation of State Constitutional Rights, 95 Harv.L.Rev. 1324, 1444-59 (1982); Zirkel at 487-88, 490-91. In many instances, the state courts specifically held that their own state constitutions were more expansive than the federal constitution where the subject of education was concerned. See, e.g., Serrano, 18 Cal.3d at 768, 557 P.2d at 958, 135 Cal.Rptr. at 374.
 
 
 78
 Although based on a shift from federal to state constitutional, rather than statutory, provisions, the general result of these post Rodriguez cases has, to some extent, foreshadowed the shift that has occurred concerning the education of handicapped children within North Carolina, Massachusetts and Michigan. See Zirkel at 487-88, 490-91. It may very well be that the State of Maryland, building on the examples of other states in the area of school finance and in the area of special education, has decided to go beyond the federal minimum in providing educational services to handicapped children. Because this issue has not been raised in the trial court, the case must be remanded for further consideration of this issue in light of its importance in this burgeoning area of the law.
 
 IV.
 
 79
 As noted supra, an initial state action was filed in this case, and a federal action likewise was filed. The state action was removed to the federal court and the two actions there joined for further proceedings. After extensive further action in the case, the court below held that the plan for the special education for Thomas was appropriate, except that the court below ordered that an additional two hours per week of tuition be afforded to Thomas.
 
 
 80
 In the state court action, the school system asked the state court to reverse the decision of the Maryland Hearing Review Board imposing on the school system requirements for Thomas which exceeded the requirements for Level IV school placement. In the federal suit, however, the parents sought a series of particularized relief findings, in some seven particular requests, i.e., a declaratory judgment that in this case a simple Level IV placement denied the child's right to a free and appropriate public education in the least restrictive environment.
 
 
 81
 In comparing the particular requests of the federal suit with the more general request of the state suit, it becomes apparent that resolving the claims of the federal action the court below in essence disposed of the more general state claims, which by then had been joined in the consolidated action after removal of the state action. However, the court below made no individual findings as to the state action claims.
 
 
 82
 In its opinion, the court below perceived its task as resolving the appropriateness of the IEP proposed for Thomas, saying "plaintiffs brought this suit ... seeking the court to review the Individualized Education Program (IEP) as interpreted by the Maryland State Board of Education for their son Thomas. The Anne Arundel County Board of Education also asks the court to review the 1988-89 IEP proposed for Thomas." In doing so, however, it did not reach the question of the comparative scope of the Maryland statute, an understandable omission, since the precise question was, so far as the record discloses, not brought before the court. Thus, this critical question remains unresolved.
 
 
 83
 The district court dealt essentially with the issues raised in the federal proceeding, and did not make a separate judgment concerning the more general issue raised in the state court proceeding which had been removed to the federal court. Thus, there remained an unresolved state issue within the pendent jurisdiction of the court below. Under the general doctrine developed from United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the district court has the discretion to remand state claims (not necessarily removed state claims) to the proper state court for resolution there. In United Mine Workers, the action was originally filed in federal court with both federal and state pendent claims. The case was tried to the United States District Court, and the appeal was from the judgment of that court. In Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), however, we find a different pattern, where the plaintiffs filed a complaint in the state court, alleging federal claims and a number of state law claims. The case was removed to federal court, thus bringing before the federal court the initial complaint embracing the federal claims and what became by removal the pendent state claims. In Cohill, the plaintiffs withdrew their federal claim after the removal to federal court, and the district court then remanded the case to the appropriate state court for the handling of the then remaining pendent state claims. Whether by withdrawal of the federal claim, as in Cohill, or by disposition of the federal claim, as in United Mine Workers, both cases left pendent state claims, and in Cohill remand was had from the district court to the state courts, while disposition of the state claims in United Mine Workers by dismissal of those claims without prejudice was suggested in United Mine Workers as an appropriate action by the district court.
 
 
 84
 The Supreme Court in dealing with the Cohill case approved the action of the district court in the remand of the pendent claims to the state courts. It should be noted that in the Cohill case, the federal claim was withdrawn before trial on the merits, a distinction from the instant case. In Cohill, the Court held that the remand was proper quoting Gibbs to the effect that the district court should refrain from deciding the pendent state claims when "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." Cohill, 484 U.S. at 350, f. 7, 108 S.Ct. at 619, f. 7.
 
 
 85
 While the factual patterns differ to some degree when comparing Cohill, United Mine Workers, and the instant case, the operative principle in both Cohill and United Mine Workers, is that remand or dismissal without prejudice is to be approved where judicial economy, convenience, fairness, and comity indicate that such action should be undertaken, and where the scope of the issue counsels remand.
 
 
 86
 In the instant case, several factors are to be considered as counseling remand here. First, the issue as to the extent of the Maryland statute protecting the educationally handicapped child is an open question, in the sense that there have been no decided cases found by this court dealing with the comparative extent of the federal act and of the state act. Second, resolution of the question of the comparative reach of the Maryland statute is of a high degree of importance to Maryland and to its citizens. Third, a definitive pronouncement on this issue by a Maryland court will be of strong help to the courts of Maryland and of the United States in applying the Maryland statute to the various fact patterns which come to these courts.
 
 
 87
 A second possible resolution to this particular problem may be found in the provisions of Maryland law permitting the certification of a question to the Court of Appeals of the State of Maryland. Acceptance of such a certification is a matter of discretion on the part of the Maryland Court of Appeals, which leaves some uncertainty as to choosing this course. Md.Cts. & Jud.Proc.Code Ann. § 12-601 (1989).
 
 
 88
 Since it seems to this court that there is strong reason for seeking the resolution of the question of the reach of the Maryland statute by the appropriate Maryland courts, it is the conclusion of this court that the matter should be remanded to the United States District Court, as set out below.
 
 
 89
 For the above-stated reasons, the district court's ruling in this case insofar as the EHA is concerned is AFFIRMED. The district court's ruling concerning the issue of awarding costs and attorney's fees in this case is likewise AFFIRMED. Since the issue of whether Maryland law is more expansive than federal law where the education of handicapped children is concerned has not been considered by the district court, the case is REMANDED to the district court for consideration of this last issue. Upon remand, the district court may itself decide to remand the case to the Circuit Court for Anne Arundel County, Maryland, from which the case brought by the Board of Education was originally removed, or to certify the question of law as to the reach of the Maryland statute to the Court of Appeals of Maryland, due to the principal and controlling importance of the issue to the State of Maryland. These decisions are left to the sound discretion of the district court.
 
 
 90
 AFFIRMED IN PART AND REMANDED.
 
 
 
 [1]
 Originally, the Act was known as the Education for All Handicapped Children Act. Later, the Act was amended, and the name was changed to the Education of the Handicapped Act
 
 
 [2]
 Clearly, the Supremacy Clause of the United States Constitution, in addition to the federal government's power to withhold funds pursuant to the EHA, prevents the States from dropping below the floor prescribed by the Act in terms of their educational services to handicapped children. Nevertheless, nothing prevents the States from building on the floor created by the EHA and requiring, via state law, a higher level of educational services for their handicapped children. See, e.g., Vogel v. School Bd., 491 F.Supp. 989 (W.D.Mo.1980); Parks v. Illinois Dep't of Mental Health & Developmental Disabilities, 110 Ill.App.3d 184, 65 Ill.Dec. 695, 441 N.E.2d 1209 (1982); see generally Zirkel, Building an Appropriate Education from Board of Education v. Rowley: Razing the Door and Raising the Floor, 42 Md.L.Rev. 466, 487-91 (1983)
 
 
 [3]
 See page 311 infra for a more detailed statement of the procedural steps taken by the parties
 
 
 [4]
 A "Level 5" program is a day-school program, and a "Level 6" program is a full-time boarding program
 
 
 [5]
 In his opinion, Judge Howard found that the Summit School has not been accredited or approved as a special education facility within the State of Maryland. The appellants do not dispute this finding, and the appellee has argued, as a result, that it is not required to reimburse the Conklins for the costs that they incurred in sending Thomas to a special education facility that is not accredited or approved by the State of Maryland. We believe that the appellee is correct and that a state cannot be held accountable for the costs that a parent has independently incurred in sending his child to an unaccredited or unapproved special education facility. A state properly has a legal right to impose certain requirements and conditions on a special education facility before the state can be forced to pay for the education of a handicapped child there. Since the Summit School has not been so accredited or approved, the State of Maryland cannot be held financially liable for the educational services that it provides to Maryland's handicapped children
 
 
 [6]
 The appellee has made much of the fact that Thomas made a one-year advancement in his test scores in the sixth grade. The appellee points to its "Level 4" placement as the reason for this advancement, and the appellee believes that this indicates that its legal obligations have been met in Thomas' case. While we concur in the district court's conclusion that the requirements of the EHA have been met when Thomas is provided "Level 4" placement and additional weekly private tutoring for the school year in question, we think that it is necessary to note that, during the relevant period, Thomas was also receiving, at his parents' expense, a high-level of attention through intensive private tutoring--especially during the summer months. Therefore, his classroom success cannot be credited exclusively to the services provided by the appellee
 In any event, the board of education has seen fit to take advantage of his advancement during the relevant period to demonstrate its compliance with the Act, and we find that annual grade promotion, with the additional instruction noted, seems easily within Thomas' grasp. Annual grade promotion may, as a result, be a reasonable barometer for measuring the progress that this handicapped child can achieve in the coming years. Although we do not mean to specify in any detail what Thomas' individualized educational program should be in the future, the barometer chosen by the appellee appears to us to be a fair standard to which the board of education could be reasonably held in the coming years. Cf. Matthew 26:52 (King James) ("[A]ll they that take the sword shall perish with the sword.")
 
 
 [7]
 This broad language should be compared with the language of the EHA and the interpretation of the Act made by the Court in the Rowley opinion. According to the EHA, a state is required to provide a handicapped child a "free appropriate public education" in the least restrictive environment. See 20 U.S.C. § 1412(5) (1990). The Court has said that this language means that the state is required to provide the handicapped child with "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203, 102 S.Ct. at 3049. The contrast between the language of the North Carolina law and the federal law could not be more striking
 
 
 [8]
 Cf. Doe v. Anrig, 692 F.2d 800, 813 (1st Cir.1982) ("As we analyze the matter, plaintiffs arguably have presented a state[-]law claim for reimbursement which the federal courts might decide under pendent jurisdiction. Because the district court has not addressed this issue and the parties have not fully argued it in this court, we remand to the district court for a determination whether state law recognizes a claim for reimbursement and whether plaintiffs have properly asserted this claim under the court's pendent jurisdiction. The district court may, if it sees substance in the possibility of a state claim, wish to consider whether certification to the Supreme Judicial Court of Massachusetts would be appropriate"). But see Muth, 839 F.2d at 120 n. 13 ("In this appeal, Muth raises for the first time the claim that Pennsylvania law goes beyond the federal minimum to set a higher substantive standard for the quality of the program which must be available to handicapped children.... Because Muth did not make this argument before the district court, we decline to express an opinion on it.")
 Based upon the reasoning of the Muth court and upon the general principle, which this court endorses, of appellate review being limited to issues actually litigated in the trial court, this court would be justified in declining to remand the present case for further development of a topic not previously raised. To do otherwise might seem to many observers as excessive judicial activism. Nevertheless, no subject is more important to the health and vitality of this nation and our court system than education. Due to the overwhelming importance of the matters presently before this court, a remand is appropriate so that the exact scope and breadth of Maryland's educational law can be known.