G, by his parents, SSGT RG, USAF,
and AG, and on their own behalf,
Plaintiff-Appellant,

v.

FORT BRAGG DEPENDENT
SCHOOLS; Department of Defense
Domestic Dependent Elementary and
Secondary Schools; Frank Cleary, Superintendent of Fort Bragg Dependent
Schools, in his official capacity; Rita
Shupe, Director of Exceptional Children's Program, in her official capacity, Defendants–Appellees.

No. 01–1845.

United States Court of Appeals,
Fourth Circuit.

Argued: May 6, 2002.

Decided: March 25, 2003.

As Amended on Grant of Rehearing
Aug. 6, 2003.

As Amended Aug. 21, 2003.

Opinion, 324 F.3d 240, amended.

**ARGUED**: Paul Lawrence Erickson, Law Firm of Paul L. Erickson, P.A., Asheville, North Carolina, for Appellant. Gary Lee Bergosh, Special Assistant United States Attorney, Raleigh, North Carolina, for Appellees. **ON BRIEF**: John Stuart Bruce, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellees.

Before LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed in part and reversed and remanded in part by published opinion. Judge WILLIAMS wrote the opinion, in which Judge LUTTIG and Judge MICHAEL joined.

## OPINION

WILLIAMS, Circuit Judge:

G, a child with autism in the Fort Bragg Dependent Schools (FBDS), appeals from a district court's[1] order in this action under

---

1. By consent of the parties, the district court referred this case to a magistrate judge to

the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400 et seq. Specifically, G appeals from the district court's order (1) holding that the Individualized Education Program (IEP) proposed by FBDS in April 1997 met the governing standard under the IDEA; (2) refusing to order "compensatory education" on the basis of FBDS's asserted failure to provide G with an education meeting that standard during the 1994–1996 school years; (3) finding that he was not a prevailing party for attorneys' fees purposes; and (4) refusing to grant him prejudgment interest on an award of reimbursement of educational expenses.[2] Because we are unable, based on the parties' arguments on appeal and the record in the district court, to determine whether the district court properly found that the April 1997 IEP met the governing standard, we reverse the district court's conclusion on that issue and remand for further proceedings. We likewise conclude that the district court erred in holding that, as a matter of law, G's request for an award of compensatory education was barred, and accordingly we reverse and remand the district court's rejection of that claim for reconsideration. We further conclude that the district court erred in finding that G was not entitled to any attorneys' fees because he was not the prevailing party on any issue, and we therefore reverse the district court's determination of that issue and remand for reconsideration. Finally, we affirm the district court's denial of prejudgment interest on the reimbursement award.

## I.

### A.

A brief overview of the relevant law and administrative processes will put the subsequent discussion of the issues in this appeal in context. Under the IDEA, states that receive federal funds for education must provide to all students with disabilities a "free appropriate public education." As defined in the IDEA, a "free appropriate public education" (FAPE) includes both instruction designed to suit the needs of the disabled child and "related services," 20 U.S.C.A. § 1401(a)(18), which include "such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education," § 1401(a)(17).[3]

The primary vehicle for delivery of a FAPE to students with disabilities is the IEP. School districts are required under the IDEA to create an IEP for each student with a disability. IEPs are to be developed for all students with disabilities through cooperation between parents and school officials. 20 U.S.C.A. § 1414(a)(5). The IEP must state, inter alia, the student's current educational status, annual goals for the student's education, the special education services and other supple-

conduct all proceedings pursuant to Federal Rule of Civil Procedure 73 and 28 U.S.C.A. § 636. For clarity, the magistrate judge is referred to throughout this opinion as the district court.

**2.** All of the relevant conduct in this case took place before the enactment of Congress's amendments to the IDEA in 1997. Accordingly, the pre-amendment version of the IDEA is applicable here. *Sellers v. School Bd. of Manassas,* 141 F.3d 524, 526 n. 2 (4th Cir. 1998). The amendments recodified and/or

altered slightly several of the sections of the IDEA cited in this opinion, but we refer throughout this opinion to the provisions as codified prior to those enactments, unless otherwise noted. The amendments would not, we believe, make any difference in the outcome of this case.

**3.** It is undisputed that G is a "child with a disability" within the meaning of 20 U.S.C.A § 1401(a)(1).

mentary aids and services to be provided to the student, and the extent to which the student will be participating in mainstream classes. § 1401(a)(20).

The IDEA establishes a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *MM ex rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 527 (4th Cir.2002) (internal citation omitted). Parents have the right to participate in their child's educational evaluation and the development of his IEP,[4] *id.,* and to receive written prior notice before any change in (or any refusal to change) the evaluation or IEP. § 1415(b)(1)(C). In the event that a parent is dissatisfied with the school's actions, § 1415(b)(1)(E) provides that parents must have "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such a child." § 1415(b)(1)(E). In turn, § 1415(b)(2) provides a right to a due process hearing "where a complaint has been received" under § 1415(b)(1)(E).

G is a student in FBDS, a school system operated by the United States Department of Defense. Supervision of Department of Defense schools is conducted by school boards elected by parents of students attending the schools, and ultimately by the Secretary of Defense. *See* 10 U.S.C.A.

§ 2164(d)(1) (providing that the Secretary of Defense "shall provide for the establishment of a school board for Department of Defense elementary and secondary schools established at each military installation under this section"); § 2164(d)(4)(A) (providing that "[a] school board elected for a school under this subsection may participate in the development and oversight of fiscal, personnel, and educational policies, procedures, and programs for the school, except that the Secretary may issue any directive that the Secretary considers necessary for the effective operation of the school or the entire school system"). Due process hearings and appeals are conducted for children in these schools by independent hearing officers (IHOs) appointed by the Director of the Directorate for the Defense Office of Hearings and Appeals (DOHA), and by the DOHA Appeal Board (the Appeal Board), respectively. 32 C.F.R. Pt. 80, App. C, ¶¶ B, D, F.

**B.**

G is the son of a Sergeant in the United States Air Force, stationed at Pope Air Force Base in Fayetteville, North Carolina. Born in April 1992, G began receiving special education in FBDS schools when he was approximately 2 1/2 years old. Because G is a child with autism and thus considered disabled under the IDEA, an IEP was developed for G when he first was enrolled at FBDS for the 1994–1995 school year,[5] and at the conclusion of each

---

4. Under the current version of the IDEA, parents are part of an IEP team which creates the IEP for a student. The IEP team also includes a representative of the school district, the child's teacher, and where appropriate, the child himself. 20 U.S.C.A. § 1414(d)(1)(B) (West 2000).

5. The educational plan developed for G covering the 1994–1995 school year was actually an "Individualized Family Service Plan"

(IFSP) because he was not yet three years old, the age at which the IDEA calls for IEPs to be developed for students with disabilities. *See* 20 U.S.C.A. § 1477(a)-(d). An IFSP is a plan of the services to be provided an infant or toddler with a disability and is thus very similar to an IEP. *Id.* The procedures for development and implementation of an IFSP, as well as the procedural safeguards guaranteeing parents' rights, are likewise very similar to those relating to an IEP. Accordingly, we will

school year thereafter. As required by the IDEA, 20 U.S.C.A. §§ 1401(a)(20), 1414(a)(5), the IEPs stated goals for G's education for the year and laid out the type and quantity of instruction he was to receive.

Around the end of the 1995–1996 school year, concerned that G did not appear to be progressing in the development of appropriate behaviors and skills, G's mother attended a conference on the "Lovaas" method.[6] After some further research, G's mother communicated to G's teachers and others within FBDS that she felt the Lovaas method held great promise for G.

In May of 1996, FBDS proposed an IEP for G for the 1996–1997 school year closely resembling that in effect during the 1995–1996 school year. The proposed IEP did not include any Lovaas techniques or methods, and G's mother rejected it. Instead, beginning in the summer of 1996, G's parents took steps to have the Lovaas method provided for G in their home by private consultants certified in its implementation.[7] To pay the cost of the program, G's parents launched an ambitious fundraising effort, eventually raising over

$37,000 from community sources. In October of 1996, shortly after the beginning of the regular school year, the Lovaas consultant who had been working with G prepared a document entitled "IEP Goals," listing goals for the following nine months. The document recommended that G continue to receive the complete Lovaas therapy at home.

G's parents kept him home from school at the beginning of the 1996–1997 school year, providing the complete Lovaas therapy at home. Because of his continued absence, FBDS administratively withdrew G from its student roster in October 1996. In November 1996, G's parents wrote a letter to the school requesting that the school provide funding for G to continue receiving the complete Lovaas therapy at home at a cost of roughly $19,000 per year.

With no affirmative response forthcoming from FBDS, G's parents continued to fund the complete Lovaas therapy in their home from private sources. Four-year-old G made significant progress in several areas, including verbally imitating some sounds, using eating utensils, and dressing himself. The district court found that "by

for simplicity's sake refer to the 1994–1995 IFSP as an IEP.

**6.** The Lovaas method is a methodology for the education of children with autism developed by Dr. O. Ivar Lovaas at UCLA. The Lovaas method "involves breaking down activities into discrete tasks and rewarding a child's accomplishments." *MM ex rel. DM v. School District of Greenville County*, 303 F.3d 523, 528 n. 8 (4th Cir.2002). While it "has been widely modified over the years by professionals and parents, ... common characteristics include intensive training one-on-one, 30–40 hours per week, discrete trial therapy (DTT), and an in-home component (as opposed to therapy in a professional setting)." *Dong v. Board of Ed. of Rochester Community Schools*, 197 F.3d 793, 797 (6th Cir.1999).

G's mother attended a conference on the Lovaas method at the recommendation of

specialists in the "TEACHH" (Treatment and Education of Autistic and Related Communication-handicapped Children) program at the University of North Carolina, who had evaluated G when he was 2 1/2 pursuant to a referral from the Case Study Committee convened by FBDS to review G's educational needs. (J.A. at 83–84.) The TEACHH evaluation was performed at FBDS's expense.

**7.** The district court found, and the parties do not dispute, that a consultant must have "nine months of full-time internship plus two years of clinical site visits" to receive Lovaas certification. (J.A. at 163.) For ease of reference, the Lovaas program as provided to G in his home by his parents and aides in consultation with a Lovaas-certified consultant will be referred to in this opinion as "the complete Lovaas therapy."

the time [the IHO] made his ruling [in December 1997], G had progressed to the point where he should be gradually transitioning to a school classroom in the near future." (J.A. at 163.) The record thus suggests that G's educational progress from 1996 to 1998 was significant.

In April of 1997, in consultation with G's mother, FBDS again proposed an IEP for G, this time for the 1997–1998 school year. G's mother rejected the IEP because, although on paper it contained the elements—that is, the instructional methods and activities—of the complete Lovaas therapy it did not provide for the complete Lovaas therapy, omitting in particular the participation of a Lovaas-certified consultant.

## C.

G's parents first requested a due process hearing in a letter dated May 16, 1997.[8] (J.A. at 13A.) In the letter, G's mother stated that "the Fort Bragg School System has failed to provide a Free and Appropriate Public Education for our child in accordance with [the IDEA], 32 C.F.R. Part 80, and other applicable laws. Our son attended the Fort Bragg School System from October 1994 to July 1996. During this time period, our son's educational gains were minimal." (J.A. at 13A.) She requested in the letter "that the Fort Bragg School System be required to provide the education my child is entitled to under the aforementioned laws." (J.A. at 13A.)

After the due process hearing, the IHO concluded that during the 1994–1995, 1995–1996, and 1996–1997 school years,

FBDS had failed to provide G a FAPE under the IDEA. Based on this finding, it ordered FBDS to reimburse G's parents for the costs they had incurred since initiating funding of the complete Lovaas therapy in their home in the summer of 1996 (costs that the IHO determined to be slightly more than $30,000) and to fund the complete Lovaas therapy as it was being provided to G in his home through July 1999.

FBDS appealed to the Appeal Board, which found that the IHO had erred in granting relief relating to the 1994–1995 and 1995–1996 school years because G's parents had not properly raised claims for relief relating to those years.[9] The Appeal Board further found that the April 1997 IEP was appropriately calculated to provide G with a FAPE and that the IHO erred in granting reimbursement to G's parents for money they spent outside of the period from November 1996 to April 1997, because November 1996 was the date on which G's parents first raised their FAPE claims, and April 1997 was the date on which the deficiencies in the provision of a FAPE were cured. Accordingly, the Appeal Board reduced the award of reimbursement ordered by the IHO to $11,117.06. Finally, the Appeal Board found that the IHO had exceeded the bounds of permissible relief in ordering the complete Lovaas therapy to be provided through July 1999. To impose such a requirement on FBDS, the Appeal Board found, would usurp the responsibilities of both FBDS and G's parents under the IDEA to reevaluate, at least annually, the appropriateness of G's educational plan.

8. While the formal request for a due process hearing was made in May 1997, the IHO, the Appeal Board, and the district court all found that G's parents' complaints were first raised in their letter of November 1996.

9. The Board's conclusion that G had not raised claims relating to the 1994–1996 school years was apparently the result of its having been provided an incomplete version of G's original complaint, which did contain claims relating to those years.

The Appeal Board found the April 1997 IEP, incorporating the approach of the Lovaas method, was sufficient to cure the earlier failure to provide a FAPE and thus struck down the IHO's prospective relief involving the complete Lovaas therapy.

G's parents then filed a civil action in the United States District Court for the Eastern District of North Carolina pursuant to 20 U.S.C.A. § 1415(e), arguing that the Appeal Board had erred in reducing the reimbursement award and eliminating the prospective Lovaas therapy required by the IHO's order. They also added claims for attorneys' fees as the prevailing party and for prejudgment interest on their reimbursement award. FBDS argued that the Appeal Board had not erred and furthermore that FBDS had provided a FAPE during the period for which reimbursement was ordered (the 1996–1997 school year). The district court concluded that FBDS had offered a FAPE in the April 1997 IEP, but that FBDS had not offered a FAPE during the 1996–1997 school year. The district court found the Board's award of $11,117.06 in reimbursement relating to the 1996–1997 school year appropriate and awarded G that amount, but it denied the prospective relief G sought, attorneys' fees, and prejudgment interest. G timely noted this appeal.

## II.

G argues on appeal that the district court erred in finding that the April 1997 IEP offered a FAPE; that the district court erred in denying him relief in the form of a prospective "compensatory education" award—including funding of the complete Lovaas therapy, involving a Lovaas-certified consultant—for FBDS's failure to provide a FAPE during the 1994–1995 and 1995–1996 school years; that the district court erred in denying him an award of attorneys' fees; and that the district court erred in denying prejudgment interest on the reimbursement award it granted him for the 1996–1997 school year.[10]

 Before turning to G's particular arguments, a brief overview of our review standards in the IDEA context is warranted. In an action under the IDEA, "a reviewing court is obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM*, 303 F.3d at 530–31 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), and *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991)). Further, "findings of fact made in administrative proceedings are considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *MM*, 303 F.3d at 531. But "we need not defer to factual recitations made by a district court from the administrative record, because that court stands in no better position than we do in reviewing the record."[11] *Id.*

 Where the administrative proceedings are two-tiered and "the Hearing Officer and Reviewing Officer have reached the same conclusion, a reviewing court is obliged to accord greater deference to

---

10. FBDS has not appealed the district court's reimbursement award and makes no attempt to challenge the conclusion on which that award was based—to wit, that FBDS failed to provide G a FAPE during the 1996–1997 school year.

11. The district court in an action brought under the IDEA "shall hear additional evidence at the request of a party." 20 U.S.C.A. § 1415(i)(2)(B)(ii). If the district court hears and considers additional evidence, we review its findings of fact for clear error. *MM*, 303 F.3d at 531. The district court heard no new evidence in this case.

their findings." *Id.* (citing *Combs v. Sch. Bd. of Rockingham County*, 15 F.3d 357, 361 (4th Cir.1994)). On the other hand, where a reviewing officer or board reaches a factual conclusion opposed to one reached by the hearing officer but in doing so departs from the normal process of fact-finding, its decision may be entitled to little or no deference. *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105–06 (4th Cir.1991).

### A. The April 1997 IEP

■ G first contends that the district court erred in finding that the April 1997 IEP proposed a FAPE. Whether an IEP is " 'appropriate' for purposes of the IDEA" (i.e., whether it meets the relevant statutory definition of a FAPE) is a question of fact in our circuit. *DiBuo v. Bd. of Ed. of Worcester County*, 309 F.3d 184, 188 n. 8 (4th Cir.2002).

After reviewing the April 1997 IEP's terms, the district court concluded that "[t]he school cured its deficiencies [in the May 1996 IEP] at the April 1997 IEP meeting and [in the] subsequently-issued plan ...," and thus offered G a FAPE. (J.A. at 183.) In reaching this conclusion, the district court noted that the April 1997 IEP "reflected significant modifications and changes made to address concerns expressed by [G's] mother after submission of the November 18, 1996 letter." (J.A. at 183 (quoting Appeals Board opinion).) G asserts that the district court erred in employing the federal FAPE standard rather than the more stringent state standard, and further, assuming the district court applied the correct law, that it erred in finding the April 1997 IEP

sufficient under the federal standard because FBDS did not have personnel with the training or experience necessary to implement the IEP.

### 1. Inapplicability of the North Carolina Standard

Under § 1401(a)(18)(B) a FAPE is defined as including "special education and related services that ... meet the standards of the State educational agency...." 20 U.S.C.A. § 1401(a)(18)(B). The Supreme Court held in *Rowley* that

> a court's inquiry in suits brought under [§ 1414(e)(2) ] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures *reasonably calculated to enable the child to receive educational benefits?* If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206–07 (emphasis added); *see also id.* at 201 (noting that the IDEA's FAPE definition, via its incorporation of "related services," "expressly requires the provision of 'such ... supportive services ...' as may be required to assist a handicapped child to *benefit* from special education") (emphasis in *Rowley*). Thus, federal law establishes a minimum "baseline" of educational benefits that states must offer students with disabilities. States are free, however, to set a higher standard for provision of educational services to those students, and North Carolina has taken this approach.[12]

---

12. North Carolina General Statutes section 115C–106(a) states that it is

the policy of the State of North Carolina ... to ensure every child a fair and full opportunity to reach his full potential and that no

child [with special needs] shall be excluded from service or education for any reason whatsoever.

N.C. Gen.Stat. § 115C–106(a) (Lexis 1999) (emphasis added). We have interpreted this

G argues that the North Carolina standard governs the services FBDS must provide because FBDS's schools are located in North Carolina and thus North Carolina's standards are the standards of "the State educational agency" referred to in 20 U.S.C.A. § 1401(a)(18)(B). *See generally Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1035 (8th Cir.2000) ("If state legislation implementing the IDEA creates a higher standard than the federal minimum, an individual may bring an action under the federal statute seeking to enforce the state standard."). FBDS argues that the North Carolina standard does not apply to it, both because Congress did not clearly express an intent to make federally run schools subject to state standards and because Congress elsewhere has provided by statute that the Department of Defense is responsible for setting substantive educational standards for Department of Defense Elementary and Secondary Schools. We review the district court's conclusion that the federal standard applies de novo.

■ For a federal installation to be subject to state laws, there must be a "clear, unequivocal, federal statutory requirement" that the entity be so subject. *Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (stating also that "an authorization of state regulation [of a federal entity] is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action'

that makes this authorization of state regulation clear and unambiguous"); *see also EPA v. State Water Res. Control Bd.*, 426 U.S. 200, 211, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) ("Federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous.").

■ As we have noted, the definition of a FAPE under the IDEA requires that educational services "meet the standards of the State educational agency." 20 U.S.C.A. § 1401(a)(18)(B). A school run by a state or political subdivision of a state, then, must meet the standards established by the governing state educational agency, which in turn must meet or exceed the IDEA's minimum requirement. The statement that a FAPE consists of education and related services that meet the state agency's standard, however, does not explicitly address the situation here—a federal entity operating a school within the borders of a state. Under the IDEA, a state educational agency is the agency "primarily responsible for State supervision of public elementary and secondary schools...." 20 U.S.C.A. § 1401(a)(17). But in the case of FBDS, there is no state agency responsible for "*state* supervision" of the schools. Thus, G's central argument on this issue fails.

Moreover, the federal statutes relating to rights of children in Department of Defense schools, 10 U.S.C.A. § 2164(f)[13] and 20 U.S.C.A. § 241(a) (West 1992) (re-

---

section as requiring more than the "free appropriate public education" required under federal law. *See In re Conklin*, 946 F.2d 306, 318 (4th Cir.1991) (stating, with respect to section 115C–106, that "within the State of North Carolina, it has been recognized that state law-makers have built upon the federal floor created by the EHA [the IDEA's predecessor, under which the federal standard was also a FAPE] and have decided to provide the handicapped children, within the state, with a level of educational services that surpasses the national minimum"); *Burke County Bd. of*

*Educ. v. Denton*, 895 F.2d 973, 982–83 (4th Cir.1990) (stating, in reference to section 115C–106(a), "North Carolina apparently does require more than the EHA").

13. Section 2164(f) states as follows:
 (1) The Secretary shall provide ...:
 (A) In the case of children with disabilities aged 3 to 5, inclusive, all substantive rights, protections, and procedural safeguards (including due process procedures) available to children with disabilities aged 3 to 5, inclusive under [the IDEA]

pealed in 1994),[14] provide no clear indication that Congress intended a federal institution such as FBDS to be subject to FAPE standards established by state regulators, as state standards are not specifically mentioned in either § 2164 or § 241. Further, the Department of Defense has promulgated regulations that mirror the substantive standards expressed in the IDEA and requires its schools to abide by those standards.[15] *See* 32 C.F.R. § 80.4(a).

We find that § 241(a)'s requirement of "comparability" to the maximum extent

practicable and its reference to the rights of children with disabilities does not amount to the clear and unequivocal federal statutory requirement necessary, to incorporate the FAPE standard of the state in which a Department of Defense school is located. Section 241(a) refers only to qualitative standards of schools in comparable communities, such as the "compensation, tenure, leave, hours of work, and other incidents of employment" of personnel hired to operate those schools, as areas in which Department of Defense schools should be comparable. It is thus a reasonable conclusion that § 241(a) was meant to

----

....
(C) In the case of all other children with disabilities, all substantive rights, protections, and procedural safeguards (including due process procedures) available to children with disabilities under [the IDEA].
(2) Paragraph (1) may not be construed as diminishing for children with disabilities enrolled in day educational programs provided for under this section the extent of substantive rights, protections, and procedural safeguards that were available under section 6(a) of Public Law 81–874 (20 U.S.C.A. § 241(a)) to children with disabilities as of October 7, 1991.
10 U.S.C.A. § 2164(f).

**14.** As of October 7, 1991, 20 U.S.C.A. § 241(a) stated that where the Department of Defense operates a school, the Secretary of Defense or a designee shall

[t]o the maximum extent practicable ... take such action as may be necessary to ensure that the education provided pursuant to [the arrangement establishing the school] is comparable to free public education provided for children in comparable communities in the State.

20 U.S.C.A. § 241(a) (West 1992) (repealed in 1994). Despite its repeal, this section's exhortation to comparability continues to apply to schools operated by the Department of Defense by virtue of the explicit reference to it in § 2164(f). *See* note 15, *infra*.

**15.** Department of Defense regulation 32 C.F.R. § 80.3(p) defines a FAPE as "special education and related services ... [that] meet the requirements of this part" without any

reference to state standards. The omission of any reference to state standards in this regulation is particularly conspicuous because § 80.3(p) otherwise mirrors the FAPE definition found in the IDEA itself; but whereas the IDEA defines a FAPE as special education and related services that meet "the standards of the state educational agency," 20 U.S.C.A. § 1401(a)(18)(B), § 80.3(p) defines a FAPE as special education and related services that "meet the requirements of *this part* [32 C.F.R. Part 80]," 32 C.F.R. § 80.3(p) (emphasis added).

While another Department of Defense regulation, 32 C.F.R. § 68.4(e), states that certain standards for Department of Defense schools "must conform to the comparable state's regulatory guidelines" for education of students with disabilities, a regulation cannot itself satisfy a requirement that *Congress* speak clearly to a given question. *See, e.g., EPA v. California ex rel., State Water Resources Control Bd.,* 426 U.S. 200, 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) ("Federal installations are subject to state regulation only when and to the extent that *congressional* authorization is clear and unambiguous") (emphasis added); *Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (same); *cf. also John v. United States,* 247 F.3d 1032, 1046 (9th Cir.2001) (en banc) (Kozinski, J., dissenting) ("If we must rely on the agency to divine the meaning of the statute, the meaning cannot be 'plain to anyone reading it.' "). Moreover, if read to require Department of Defense Schools to comply with state FAPE standards, § 68.4(e) is difficult to reconcile with § 80.3(p).

compare schools operated by the Department of Defense to schools in comparable communities only in more general terms such as the conditions under which school personnel are employed to provide education to all, rather than only disabled, students. Section 2164(f)(2)'s reference to the rights of children with disabilities under § 241(a) may reasonably be read as indicating that § 2164(f)(1), in requiring that the IDEA's protections be extended to children with disabilities in schools operated by the Department of Defense, does not relieve the Department of Defense of its burden, applicable with respect to the education of all its students, to ensure that the education those children receive remains generally comparable to education provided in comparable communities, as measured by indicators such as compensation, tenure, hours of work, and other incidents of employment.[16]

In sum, G has not identified, nor have we found, any clear expression of congressional intent to subject federal entities to state FAPE standards in providing education under the IDEA. Statutory references to "substantive rights and procedural safeguards under the IDEA" do not unequivocally refer to FAPE standards enacted by the states, because as the Supreme Court made clear in *Rowley*, the IDEA itself contains a substantive FAPE standard. We conclude that the federal standard embodied in the IDEA, then,

rather than North Carolina's "full potential" standard, governs G's IEPs.

### 2. *Whether the April 1997 IEP Proposed a FAPE Under the IDEA Standard*

■ Having determined that the federal standard applies, we must next address the question of whether G's April 1997 IEP was "reasonably calculated" to provide G meaningful educational benefit. The parties agree that "on paper"—that is, in the instructional methods and activities proposed—the April 1997 IEP is reasonably calculated to provide G educational benefit, but dispute whether FBDS is able to implement the IEP.[17] We conclude that the record before us is insufficient to permit a reasoned conclusion as to whether FBDS could implement the April 1997 IEP as proposed in a way that would provide educational benefit to G.

As we have noted, G asserts that FBDS is unable, without the involvement of a Lovaas-certified consultant, to implement the April 1997 IEP in a way that would provide him educational benefit. G contends that the April 1997 IEP is deficient because it does not propose that the necessary role of the Lovaas consultant will be filled by anyone with comparable training or experience. In support of this argument, G relies primarily on the finding of the IHO that "[t]he Lovaas Consultant is

---

**16.** We note also that § 241(a) refers to schools "in comparable *communities* in the State," rather than simply "in the State." In the case of a locally operated school, however, a FAPE is defined under the IDEA by the standard of the *state* educational agency—the standard does not vary by "community." 20 U.S.C.A. § 1401(a)(18) (defining a FAPE as, inter alia, education and related services that "meet the standards of the State educational agency"). Thus § 241(a)'s exhortation to comparability would be an unusual method for Congress to have chosen if it meant to impose on the Department of Defense the

obligation of complying with state FAPE standards.

**17.** While the parties agree that the 1997 IEP is appropriate "on paper," they disagree as to the necessity of a Lovaas-certified consultant's involvement in implementing the IEP. We have described this dispute as one over the "implementation" of the IEP, but it could also be described as a dispute over the IEP's contents (i.e., the IEP's failure to call for a Lovaas-certified consultant's involvement).

the heart of the Lovaas program." (Appellant's Br. at 29 (citing IHO decision, J.A. at 93).) In response, FBDS casts the substantive dispute with respect to the April 1997 IEP—whether or not a Lovaas-certified consultant was necessary to provide G a FAPE—as a dispute over the choice of educational methodology included in the IEP, an area ill-suited to judicial second-guessing.

After an extensive hearing, the IHO found that the April 1997 IEP was insufficient because "[n]either G's current therapists nor his special education teacher during 1995–96 are presently able to adequately perform the function of … a Lovaas consultant based on their current qualifications." (J.A. at 93.) The IHO explained that

> the Lovaas consultant is the heart of the Lovaas program. "Lovaas" is not simply a methodology that any educator may employ with success, but rather, the experience, insight, and adaptability that the consultant brings "to the chair" are what is essential.

(J.A. at 93.)

The IHO's decision was reversed by the Appeal Board, which found that the April 1997 IEP had proposed a FAPE. The Appeal Board reasoned that the IHO had given insufficient deference to the educational professionals who created the IEP, that the IHO "erred by comparing the April 1997 IEP to the Lovaas program," and that the April 1997 IEP "was not merely a repetition of the May 1996 IEP," which the IHO had already found inadequate. (J.A. at 126–27.) The district court affirmed the Appeal Board's decision, finding that the April 1997 IEP proposed a FAPE because it "reflected significant modifications and changes made to express concerns expressed by [G's] mother," including an increase in the number of Pre–Academic Skills Goals listed. (J.A. at 182–83.) Neither the Appeal Board nor the district court considered evidence apart from that assessed in the first instance by the IHO.

While we ordinarily would owe deference to FBDS's simple assertion that it is capable of implementing the April 1997 IEP, *see MM ex rel. DM v. School Dist. of Greenville County,* 303 F.3d 523 (4th Cir. 2002), in this case the IHO, after considering extensive evidence, concluded that FBDS personnel who were not Lovaas-certified and did not have comparable training or experience could *not* adequately implement the teaching methods called for in the April 1997 IEP. The IHO's determination, however, does not appear to have been based on an evaluation of the evidence under the proper standard. Rather than assessing FBDS's ability to provide G educational benefit under the April 1997 IEP, the IHO assessed FBDS's ability to replicate the complete Lovaas therapy. That is, the IHO's conclusion was premised not on an analysis of whether the April 1997 IEP was "reasonably calculated to provide educational benefit" to G, but instead on examination of whether that IEP would replicate the benefit to G of the complete Lovaas therapy, which had been successful for him. (J.A. at 93 ("The April 1997 IEP does not propose to continue the complete behavioral therapy program for G although it has been proven empirically to work with G as well as some other autistic preschool-age children…. As has sometimes been observed, if it isn't broken, don't 'fix' it.")); *id.* (noting that without the consultant, there would be "no assurance that the Lovaas curriculum, including daily documentation, would be consistently followed").

Neither the Appeal Board nor the district court addressed FBDS's ability to implement the April 1997 IEP as proposed (that is, absent a Lovaas-certified consul-

tant's involvement) or provided an independent assessment of the educational benefit G would receive from that IEP. This is thus an unusual case in that, even after the conclusion of the administrative process and a trial of the issues in the district court, none of the decisions below reflect a thorough assessment of the evidence under the proper standard—that is, whether the April 1997 IEP, as proposed, was "reasonably calculated to provide educational benefit" to G. Having examined the record and the parties' arguments thoroughly, we conclude that they are not sufficient to support a reasoned analysis and conclusion in this court on the issue of FBDS's ability to implement the April 1997 IEP as proposed. Accordingly, we reverse the district court's judgment on this issue and remand for such further proceedings as are required to resolve the parties' conflict under the proper standard.

### B. G's Request for an Award of Compensatory Education

G next asserts that the district court erred in denying his request for an award of compensatory education based on FBDS's failure to provide him a FAPE during the 1994–1996 school years. We conclude that the district court erred in rejecting G's claim on the ground that his parents failed to object to his IEPs during 1994–1996, and accordingly reverse its judgment and remand for reconsideration of this issue.

In a section of its opinion entitled "Was a FAPE provided for school years 1994–1996?," the district court addressed and rejected G's claim that he was entitled to compensatory education relating to those school years.[18] (J.A. at 174–80.) The district court noted that G's parents had not asserted their claim regarding FBDS's failure to provide a FAPE during the 1994–1996 school years until November 1996, "when G's mother requested that [FBDS] pay for G's homeschooling and Lovaas instruction," and thus FBDS was not aware that G's parents objected to the educational services he received during those school years until well after they had concluded. (J.A. at 179.) The district court reasoned that "[i]f the parents believed that [FBDS was] denying their child a FAPE, it was incumbent on them to bring that to the school's attention via the available statutory mechanisms," and on that basis denied relief. (J.A. at 179.) In this connection, the district court noted that "[s]chool boards must be given adequate notice of problems if they are to remedy them, and must be given sufficient time to respond to those problems before they can be held liable for failure to act." (J.A. at 179–80 (citing *Combs*, 15 F.3d at 363–64).)

■ Several of our sister circuits have concluded that an award of "compensatory education"—educational services ordered by the court to be provided prospectively to compensate for a past deficient program—may be "appropriate relief" under the IDEA. *See, e.g., Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 (3d Cir. 1999) (recognizing appropriateness, in some circumstances, of award of compensatory education beyond age 21 and re-

18. As we have noted, the Appeal Board did not specifically address G's arguments related to the 1994–1996 school years. *See* note 9, *supra*. The Appeal Board did, however, address the prospective relief ordered by the IHO, finding it insupportable. Specifically, the Appeal Board stated that that the prospective relief ordered by the IHO "usurp[ed] the authority and responsibility of [the IEP team] to periodically develop and review the Child's IEP" and "constituted an impermissible micro management of [FBDS]." (J.A. at 136.) Accordingly, the Board concluded that the IHO had abused his discretion and reversed his order of prospective relief.

manding for determination of whether it should be awarded); *Board of Ed. of Oak Park & River Forest High School Dist. 200 v. Illinois State Bd. of Ed.,* 79 F.3d 654, 656 (7th Cir.1996) (stating that the IDEA's authorization to courts to grant "appropriate" relief "encompasses the full range of equitable remedies and therefore empowers a court to order adult compensatory education if necessary to cure a violation"); *Parents of Student W. v. Puyallup School District,* 31 F.3d 1489, 1496 (9th Cir.1994) (same); *Pihl v. Massachusetts Dept. of Educ.,* 9 F.3d 184, 188 (1st Cir.1993) (same); *Hall v. Knott County Bd. of Ed.,* 941 F.2d 402, 407 (6th Cir.1991) (same); *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857–58 (11th Cir. 1988) (same); *Miener v. Missouri,* 800 F.2d 749, 753 (8th Cir.1986) (recognizing appropriateness of compensatory education award and holding that plaintiff was entitled to recover compensatory education if she prevailed in her claim that she was denied a FAPE for several years). Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student. We agree with every circuit to have addressed the question that the IDEA permits an award of such relief in some circumstances. As we explain below, because the district court's basis for rejection of G's compensatory education claim involved an erroneous legal conclusion, we reverse its rejection of that claim and remand for reconsideration.

▆ The district court concluded that an award of compensatory education was inappropriate in this case because G's parents failed to object during the 1994–1996 school years to the IEPs under which G was receiving educational services. As we have noted, the district court cited *Combs* as authority for this proposition, stating that "the IDEA should cannot be used as a sword to punish school districts unaware of parents' concerns." (J.A. at 179 (citing *Combs,* 15 F.3d at 363–64).)

We addressed in *Combs* whether a party "may recover attorneys' fees as the prevailing party in an action brought under the attorneys' fees provision of the [IDEA] against the School Board" where "the School Board's actions were deemed to be in accordance with the [IDEA], but the School Board later made some changes that comported with [the plaintiff's] demands." *Id.* at 357–58. Thus, our statement in *Combs* referred only to liability of the school district where its actions were in compliance with the IDEA, and is inapplicable here. Moreover, other courts have concluded that "failure to object to [a child's] placement does not deprive him of the right to an appropriate education." *Ridgewood,* 172 F.3d at 250 (rejecting the contention that failure to object to an IEP while in force categorically bars relief related to that IEP). Accordingly, the district court's rejection of the compensatory education claim was based on an erroneous legal conclusion, and we therefore reverse the court's judgment as to this issue.[19] We think it worthwhile, however, to note that our reversal is predicated only on the district court's erroneous legal conclusion, and not on an assessment of the merits of an award of compensatory education in this case. We leave that issue to be decided on remand.

### C.

▆ G next asserts that the district court erred in determining that he was not

---

**19.** Neither the district court's conclusion nor FBDS's "waiver" argument on appeal is predicated on a statute of limitations theory, and accordingly we have no occasion to address whether any such limitations period might apply.

a "prevailing party" and thus not entitled to an award of attorneys' fees under the IDEA's attorneys' fees provision, 20 U.S.C.A. § 1415(e)(4)(B). The district court found that because the goal of G's IDEA action had been to have the complete Lovaas therapy adopted by the school and the court had declined to compel the school to adopt the complete Lovaas therapy, G had not "prevailed" in the suit. The district court stated that there had been no "material alteration of the legal relationship of the parties," without addressing the award of over $11,000 in reimbursement expenses to the plaintiffs. (J.A. at 186.) It further suggested that without prospective relief, a party cannot be the prevailing party on a claim under the IDEA. (J.A. at 187.) The designation of a party as a prevailing (or non-prevailing) party is a legal determination that we review de novo. *Smyth v. Rivero,* 282 F.3d 268, 274 (4th Cir.2002).

 The IDEA states in relevant part that

In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

§ 1415(e)(4)(B). The Supreme Court has noted that even an award of nominal damages makes a party the prevailing party. *Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Resources,* 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (noting that "even an

award of nominal damages suffices" to make a party a prevailing party) (citing *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). An award of attorneys' fees conditioned on a party's having prevailed does not require the party to have prevailed on every claim; the party's obtaining judicially sanctioned and enforceable final relief on some claims is sufficient.[20] *See, e.g., Rum Creek Coal Sales, Inc v. Caperton,* 31 F.3d 169, 174 (4th Cir.1994) (noting that a party may receive attorneys' fees as a prevailing party "[w]hen [it] prevails on only some of the claims made"); *see also Richardson v. Miller,* 279 F.3d 1, 3 (1st Cir.2002) ("a plaintiff need not prevail on every claim and obtain all relief sought to qualify as a prevailing party"). Accordingly, the district court's award of reimbursement of over $11,000 in expenses to G was an enforceable legal judgment which plainly rendered G a prevailing party for purposes of the IDEA, and we reverse its holding that G was not a prevailing party.

### D.

 Finally, G argues that the district court erred in refusing to grant him prejudgment interest on the reimbursement award. The district court determined, in ruling on a motion to reconsider its earlier judgment, that prejudgment interest should not be awarded because the plaintiffs were not the prevailing party, and that because the reimbursement award "did not make the plaintiffs whole under their theory of the case," an award

---

**20.** A district court exercising its discretion in awarding attorneys' fees must of course consider the award requested in light of the claims on which the party prevailed and the overall work performed by the attorney. *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("There is no precise rule or formula for making [attorneys' fees] determinations [where the party

has prevailed on only some claims]. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."). Thus, the district court should consider on remand whether G has prevailed on other issues in addition to receiving the reimbursement award.

of prejudgment interest would not serve to complete an award that made G "almost whole." (J.A. at 210.) A district court's denial of an award of prejudgment interest is reviewed for abuse of discretion. *Mary Helen Coal Corp. v. Hudson,* 235 F.3d 207, 210 (4th Cir.2000) (noting that "the award of prejudgment interest is within the discretion of the district court"); *Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1030 (4th Cir.1993) (en banc) ("ERISA does not specifically provide for prejudgment interest, and absent a statutory mandate the award of prejudgment interest is discretionary with the trial court"). G asserts that failure to award prejudgment interest rendered the reimbursement award inadequate to make G's education "free" within the meaning of the term "free appropriate public education" in the IDEA and that "[i]t is unjust to allow [FBDS] an involuntary interest-free loan from [G's parents]." (Br. of Appellant at 14.) FBDS asserts that the district court did not abuse its discretion in determining that no award of prejudgment interest was warranted.

 Although not raised by FBDS until its petition for rehearing, we now address the question of sovereign immunity. *See Medina v. United States,* 259 F.3d 220, 223–24 (4th Cir.2001) (noting that sovereign immunity is jurisdictional in nature, and failure to raise the issue does not prevent the court from considering it). A waiver of sovereign immunity does not permit an award of interest against the government unless that waiver expressly extends to interest. *See Library of Congress v. Shaw,* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("In the absence of express congressional consent to the award of interest separate from a gen-

eral waiver of immunity to suit, the United States is immune from an interest award."); *see also Gatlin Oil Co., Inc. v. United States,* 169 F.3d 207, 213 (4th Cir. 1999).[21] Congress has not waived the sovereign immunity of the United States with respect to awards of prejudgment interest in actions under the IDEA. No provision in § 2164, nor in any part of the IDEA, contains such an express waiver. Accordingly, sovereign immunity bars an award of prejudgment interest against the United States. The district court's rejection of prejudgment interest is therefore affirmed.

### III.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND REVERSED AND REMANDED IN PART*

---

**21.** FBDS concedes, and we agree, that 10 U.S.C.A. § 2164, discussed above, provides a general waiver of sovereign immunity in IDEA actions. *See* 10 U.S.C.A. § 2164(f)(1)(C).